UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

KASEEM STUKES,

                    Petitioner,              07 Civ. 3400
                                             03 Cr. 601

     -against-

                                             OPINION

UNITED STATES,

                    Respondent.

------------------------------------X

A P P E A R A N C E S:

          Pro Se

          KASEEM STUKES
          Prisoner Number 55047-054
          F.C.I. Fairton
          P.O. Box 420
          Fairton, New Jersey  08320

          Attorneys for Respondent

          MICHAEL J. GARCIA
          United States Attorney for the
            Southern District of New York
          U.S. Attorney's Office, SDNY
          One St. Andrew's Plaza
          New York, NY 10007
          By:  Harry A. Chernoff, Esq.

**Sweet, D.J.**

Kaseem Stukes ("Stukes" or the "Petitioner") has moved pursuant to Title 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence imposed upon his conviction after trial which was thereafter affirmed. For the reasons set forth below, the motion is denied and the petition dismissed.

## I.   PRIOR PROCEEDINGS

Indictment S1 03 Cr. 601 (RWS) (the "Indictment") was filed on September 16, 2003, charging Stukes with distributing and possessing with intent to distribute cocaine base (in a form commonly known as "crack" cocaine), in violation of Title 21 United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C) (Count One) on or about January 14, 2003; in relation to the drug crime charged in Count One, using and carrying a firearm, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i) (Count Two); possessing that firearm after having been convicted of the felony of possession of a loaded firearm in New York State Supreme Court, in violation of Title 18, United States Code, Section 922(g)(1) (Count Three); and, on or about April 24, 2003, again distributing and possessing with intent to distribute cocaine base, in violation of Title 21,

1

United States Code, Sections 812, 841(a)(1), and 841(b)(1)(C)
(Count Four).

Following jury trial, Stukes was convicted on all four
counts. On November 23, 2004, this Court sentenced Stukes to a
term of 106 months' imprisonment, comprising concurrent terms of
46 months' imprisonment on Counts One, Three, and Four followed
by a mandatory consecutive term of 60 months' imprisonment on
Count Two.

Stukes timely appealed his conviction and sentence.
On consent of the parties, the Court of Appeals returned the
mandate to the District Court for consideration of whether to
resentence in light of the Supreme Court's decision in United
States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's
decision in United States v. Crosby, 397 F.3d 103 (2d Cir.
2005). On October 17, 2005, this Court reduced the sentences on
Counts One, Three, and Four to 33 months' imprisonment each,
resulting in an aggregate sentence of imprisonment of 93 months.
The other components of the original sentence remained the same.
Stukes appealed again, and his conviction was affirmed by
summary order.

2

Stukes filed his section 2255 motion on April 2, 2007, and the Government's opposition was filed on November 8, 2007, at which time the motion was marked fully submitted.

## II.  FACTUAL BACKGROUND

An account of the trial and related proceedings upon which Stukes has based his motion follows.

Stukes was arrested by a team of New York City Police Department ("NYPD") officers assigned to patrol a Bronx public housing project, across the street from which Stukes was engaged in hand-to-hand sales of crack cocaine in front of a strip mall. The officers commenced surveillance of Stukes from within the apartment complex using remote-controlled video cameras mounted on various points around the buildings, a surveillance system called "VIPER." After having observed Stukes make several sales to individual customers, each of whom was arrested shortly thereafter in possession of crack cocaine, a team of officers approached Stukes and arrested him.

Sergeant John Patane, who supervised the team of NYPD officers assigned to patrol the housing project, testified principally concerning his observations from the "VIPER room,"

3

where he monitored the relevant events and the actions of his
team. Tr. 73-149.[1]  On January 14, 2003, Sergeant Patane used
the VIPER system to observe Stukes engage in transactions with
several individuals, who were placed under arrest shortly after
each transaction. Sergeant Patane was advised over the police
radio that crack cocaine was recovered from each of these
individuals. Tr. 101-03.

After Sergeant Patane gave instructions to the field
team to arrest Stukes, he observed by use of the video cameras
the defendant running from the officers who had confronted him.
Tr. 104-05. Although Sergeant Patane was unable to observe a
firearm, he was advised over the radio by a member of his arrest
team that "Mr. Stukes had a gun and that he had thrown it to the
ground, and they picked up a gun." Tr. 105. Sergeant Patane
initially summoned the NYPD's Emergency Services Unit ("ESU") to
assist with the recovery of evidence, including the gun. When
Sergeant Patane learned that the gun had been recovered already,
he redirected ESU to the precinct to assist with unloading the
firearm that had been recovered by the arrest team. Tr. 106-07.

---

[1] "Tr." refers to the transcript of the trial in this matter; "Mot." refers to
the Petitioner's motion.

Officer Annette Francesquini participated in the arrest of an individual who Sergeant Patane had observed engaging in a transaction with Stukes on the night of January 14, 2003. Officer Francesquini recalled that crack cocaine was recovered from that customer's shopping bag. Tr. 300. She also participated in Stukes' arrest, arriving at the scene in a police van shortly after Stukes had been apprehended. Tr. 303. On the short trip to the scene, Officer Francesquini heard fellow Officer Donald Johnson broadcast over the police radio that Stukes had a gun. Tr. 303.

Officer Johnson, who also testified at trial, participated in the arrests of two other customers of Stukes, from whom he recovered four bags of crack cocaine. Tr. 364-65. Thereafter, Officer Johnson participated in Stukes' arrest, in particular, by chasing Stukes along the side of the strip mall. Tr. 368. During the chase, Officer Johnson saw Stukes throw a gun to the ground and saw a magazine fall out of the gun. Tr. 369. At that point, Officer Johnson broke off the chase in order to recover the gun and the magazine. Tr. 370. After the arrest, Officer Johnson handed the gun and the magazine which was loaded with ammunition to Officer Kevin Finegan. Tr. 370-72; see also Tr. 401, 404. Officer Johnson also turned over the crack cocaine to Officer Finegan, who was the designated

5

arresting officer for purposes of arrest and property paperwork.
Tr. 365.

The NYPD officers involved in Stukes' arrest not only
saw the gun, but heard it as it fell to the ground. Officer
Edwin Martinez, in particular, participated with Officer Johnson
in the chase of Stukes, during which Officer Martinez heard the
sound of the firearm hitting the pavement. Tr. 419.

Officer Finegan was the officer responsible for arrest
paperwork and property vouchering that night. Tr. 482-83, 489.
Officer Finegan had been stationed in the VIPER room with
Sergeant Patane, and shared Sergeant Patane's recollections
concerning the narcotics transactions that they had observed
over the video cameras and about which they had received
contemporaneous radio reports. Tr. 484-87. Officer Finegan
also recalled Officer Johnson's radio report that Stukes had
thrown a gun before being stopped by Officer Martinez and
another officer. Tr. 488.

Officer Finegan recalled receiving the firearm
evidence from Officer Johnson at the police base rather than the
arrest scene. Tr. 496. With specific respect to the firearm,
Officer Finegan testified that, based on its markings and its

6

serial number, he recognized it as the one he had vouchered on the night of Stukes' arrest. Tr. 490-91. He further testified that he had received the firearm from Officer Johnson, who had told him the circumstances of its recovery and had given it to him as the designated arresting officer. Tr. 496.

Officer Finegan recalled placing the firearm, the magazine, and the bullets in a cardboard box to avoid further handling of the evidence. Tr. 497. He then sent the box to the NYPD laboratory for fingerprinting and firearms analysis. Tr. 503. With the box, he included a copy of the property voucher and his request for laboratory examination. Tr. 503.

Officer Regina Burgos, a fingerprints analyst from the laboratory, received in a sealed box the gun bearing the serial number reflected on Officer Finegan's property voucher, as well as a magazine and bullets, which she identified as Government Exhibits 23, 24, and 25, respectively. Tr. 666-67. Officer Burgos tested all of these items for fingerprints with negative results. Tr. 667-68.

Detective Sean Hart then carried out the requested ballistics examination of the evidence. He recalled receiving this evidence from the laboratory's evidence control room in a

7

sealed box bearing Officer Burgos' initials. Tr. 638-39.
Before carrying out his examination, Detective Hart prepared an
inventory of the items in the box, and all of the items
described on the associated property voucher appeared to be
present. Tr. 639.

During his examination, Detective Hart determined that
the magazine that he had received in the evidence box could not
fit the firearm he had received. Tr. 640. Specifically, by
reviewing items in the collection of the NYPD ballistics
reference library, Detective Hart determined that the magazine
in the sealed box had been manufactured for a Bryco 9 millimeter
firearm, not for the Hi-Point 9 millimeter firearm later
admitted into evidence. Tr. 642-43; 654-55. A Bryco 9
millimeter firearm, its magazine, and a Hi-Point 9 millimeter
magazine, all of which were obtained from the NYPD's ballistics
reference library, were admitted at trial as Government Exhibits
33, 34, and 35, respectively. Tr. 655-57.

On the final full day of trial, the Government brought
to defense counsel's attention the fact that a photograph that
had been produced as Jencks Act material appeared to call into
question whether the magazine in evidence at trial was in fact
the magazine recovered by Officer Johnson and vouchered by

8

Officer Finegan. See Tr. 732-33. Defense counsel

"compliment[ed] and appreciate[d] the government's coming

forward" with the information, acknowledging that a copy of the

photograph had previously been produced to him and that "the

evidence was always available for my inspection." Tr. 737.


The photograph, marked for identification as Exhibit

3506N, was a Polaroid photograph taken at the station house on

the night of Stukes' arrest. Tr. 732. It depicted the firearm,

the correct magazine for the firearm, and a brown paper wrapper,

which the Government contended had likely contained the bullets

that spilled out of the magazine. Tr. 772; 780. The evidence

was inside a cardboard box similar to that described by the

witnesses, and the officers' badges were arrayed around it to

memorialize the arrest. Tr. 732.


Defense counsel called the Government's case agent,

Detective Anthony Curtin, as his only witness, in order to

discuss certain allegations made by Detective Curtin in the

criminal complaint. Tr. 744-55. Defense counsel did not

examine Detective Curtin on the magazine discrepancy evidenced

by Exhibit 3506N.

After Detective Curtin testified, the Court heard argument on Stukes' motions for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, and for the Court to strike the physical evidence recovered on January 14, 2003. During the argument, the parties provided additional information concerning Exhibit 3506N. Based on his review of the photograph, defense counsel noted that "the government concedes the magazine, Government Exhibit 24 that's in evidence, is not what was recovered that night." Tr. 765. From there, defense counsel argued that all of the evidence, including the narcotics evidence, should be stricken because of purported defects in the chain of custody. Tr. 765-68. The Government responded that it would not be making arguments concerning the magazine or the bullets, but that "[w]hat's clear is that this gun that was recovered that night is the one [Officer] Finegan vouchered." Tr. 772.

After a lengthy colloquy, the Court proposed to "strike the magazine and bullets based on the photograph," if the defense so desired. Tr. 782. After consulting with Stukes, defense counsel requested that the magazine and the bullets be stricken. Tr. 783. The Court granted this request, but denied the defendant's Rule 29 motion, noting that the firearms

10

offenses charged did not require the gun to be operable.   Tr.
783-84.


          The Government's initial summation made no reference
to the magazine and bullets that had been stricken by the Court,
and therefore did not address any apparent inconsistency between
Officer Johnson's testimony that the magazine had fallen out of
the gun and Detective Hart's testimony that the magazine
vouchered as arrested evidence could not have been inside the
gun.   Defense counsel addressed Officer Johnson's testimony as
follows:

          Ah, Officer Johnson.   Officer Johnson says
          the gun, man, that's the gun, I know that
          gun.   I know because when a gun hit the
          ground, I saw the magazine fall out.   That's
          not   possible.     Because  we   hear   from
          Detective Hart it doesn't fit.

Tr. 818.


          On rebuttal, in response to the argument that Officer
Johnson's testimony was demonstrably false because of Detective
Hart's testimony concerning the gun's magazine, the Government
argued that Officer Johnson may simply have been mistaken:

          [I]t is a reasonable mistake to make.   If it
          couldn't have taken place, all you know is
          that   Kaseem   Stukes   threw   the   gun   and
          magazine at the same time, and they bounced
          apart, it makes sense that Officer Johnson
          concluded the magazine fell out of the gun.

>           If that was impossible, then it is a mistake
>           that he made with his own eyes.  It doesn't
>           suggest to you that the gun wasn't thrown.
>           It doesn't suggest to you the gun wasn't
>           there.

Tr. 834-35.


The jury commenced deliberations at 3:35 p.m. on November 24, 2003.  Tr. 876.  At approximately 5:00 p.m., the jury informed the Court that it had reached a verdict, Tr. 880, which was published the next morning, finding the defendant guilty on all counts.  Tr. 885.


Stukes filed a motion to set aside the verdict, contending that the Court erred in admitted virtually all of the physical evidence against him, including the crack cocaine, the handgun, and the currency.  See United States v. Stukes, No. 03 Cr. 601 (RWS), 2004 WL 2397194 (S.D.N.Y. Oct. 26, 2004).  The Court denied the motion, and observed that Officer Johnson's testimony, "combined with the Polaroid photograph from the arrest showing a magazine that would have fit inside of the gun, indicates it was the magazine, not the gun, recovered during the course of Stukes' arrest that was subsequently misplaced."  Id. at *7.

On November 29, 2004, Stukes was sentenced to 106 months imprisonment, to be followed by concurrent terms of three years' supervised release. United States v. Stukes, No. 03 Cr. 601 (RWS), 2004 WL 2721161 (S.D.N.Y. Nov. 29, 2004). The Court concluded that, after grouping Stukes' narcotics and firearms convictions pursuant to United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") §§ 3D1.2 and 3D1.4, the combined offense level was 21. Id. at *1-2. The Court further determined that Stukes' two prior convictions resulted in four criminal history points and placed him in Criminal History Category III. Id. at *2. Thus, the Court found that the applicable Guidelines range was 106 to 117 months' imprisonment, which comprised a range of 46 to 57 months' imprisonment on each of Counts One, Three, and Four, plus a mandatory consecutive term of imprisonment of 60 months on Count Two.

Stukes appealed his conviction, and the parties consented to a remand pursuant to Booker and Crosby. On September 30, 2005, the Government presented testimony from a cooperating witness, from which it could be concluded that "on at least several occasions Stukes' conduct indicated that he engaged in drug sales in addition to those which were the subject of the indictment and for which he was tried." United States v. Stukes, No. 03 Cr. 601 (RWS), 2005 WL 2560244, at *1

13

(S.D.N.Y. Oct. 12, 2005). This Court adhered to its original
Guidelines calculations, but lowered Stukes' sentence in light
of the Court's view that an inappropriate disparity existed
between sentences for powder cocaine and crack cocaine offenses.
Id. at *2. The Court thus recalculated the defendant's offense
level to be 18 and reduced the sentence on Counts One, Three,
and Four to the bottom of the recalculated Guidelines range, 33
months, yielding a total sentence of 93 months' imprisonment.

Stukes appealed his conviction, challenging the
sufficiency of the evidence concerning his possession of a
firearm and challenging the Court's admission pursuant to Rule
404(b) of the evidence of Stukes' prior conviction for firearms
possession. Although Stukes was represented by new counsel on
appeal, appellate counsel did not raise ineffectiveness of
counsel, nor did he assert prosecutorial misconduct, the two
grounds Stukes raises in the instant motion. By summary order,
the Court of Appeals rejected Stukes' challenge to the
sufficiency of evidence, noting the "substantial body of
evidence the government presented at trial, including the
uncontroverted eyewitness testimony of a New York Police
Department officer and the corroborating testimony of four other
officers . . . ." United States v. Stukes, 186 Fed. Appx. 150,
151 (2d Cir. 2006).

14

**III. DISCUSSION**

## A.    Prosecutorial Misconduct Has Not Been Established

In his unsuccessful appeal, Stukes contended that the
firearm admitted in evidence could not have been the correct one
and that therefore the evidence was insufficient to support the
relevant counts of conviction. By this motion, Stukes contends
that the Government knew or should have known that the magazine
offered in evidence was not the magazine seized from him, that
the Government "came clean" only after the Government rested and
that the Government engaged in misconduct by failing earlier to
bring to the Court and Stukes' attention quasi-exculpatory
material that Stukes and his attorney had failed to grasp from
the discovery materials.

Stukes has not established that the Government went
into trial aware of the questionable provenance of the magazine
it offered into evidence. Stukes' allegations of the
Government's bad faith are belied by (1) the fact that the
Government first raised the concerns about the magazine, (2) the
Government's consent to the magazine being stricken from
evidence, and (3) the fact that the 3506N had previously been

15

provided to the defense, which had overlooked the issue.  It

stands to reason that, had the Government not brought the photo

to defense's attention, the trial would have concluded without

the issue ever being raised.

Moreover, the issue was raised before the defense

case, and the defense had ample opportunity to exploit the

discrepancy.  Defense counsel chose not to do so, choosing

instead to argue in summation that Officer Johnson was an

unreliable witness based on his testimony about the magazine in

evidence.  As this Court noted in October, 2004:

> Defense counsel appeared to recognize that
> the fact that the magazine that had been
> before the jury did not fit the gun favored
> the defendant, not the government, when he
> made the strategic choice not to elicit any
> testimony concerning the Polaroid photograph
> and related issues during the defense case.
> Instead, defense counsel went on in
> summation to use the fact that the stricken
> magazine could not have fit the gun to
> impeach  Officer  Johnson's  testimony
> generally:  "Ah, Officer Johnson.  Officer
> Johnson says the gun, man, that's the gun, I
> know that gun.  I know because when a gun
> hit the ground, I saw the magazine fall out.
> That's not possible.  Because we hear from
> Detective Hart that it doesn't fit."

Stukes, 2004 WL 2397194 at *7 n. 8.  In response, the Government

conceded in its rebuttal that Johnson could have been mistaken

about the magazine falling from the gun when it was thrown, but

argued that his testimony should otherwise be credited.

Stukes further contends that the Government elicited perjured testimony from Officer Johnson insofar as he testified that he believed that the magazine had bounced out of the gun. However, given the circumstances of the trial as set forth above, there is no indication that Officer Johnson gave false testimony. See also Stukes, 2004 WL 2397194 at *7.

Moreover, because Stukes failed to raise this issue on direct appeal, and in fact took an entirely different approach to the issue in challenging the sufficiency of the evidence, he is procedurally barred from asserting this claim on a section 2255 motion. It is well-settled that federal prisoners may not employ section 2255 as a substitute for direct appeal. See United States v. Frady, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."); see also United States v. Addonizio, 442 U.S. 178, 184-85 (1979). As the Supreme Court explained in Frady, "[o]nce the defendant's chance to appeal has been waived or exhausted . . . we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already had a fair opportunity to present his federal claims to a federal forum." 456 U.S. at 164. A prisoner who "fail[s] properly to raise his claims on direct review," therefore, is

17

barred from obtaining collateral relief under section 2255 unless he "establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged [error].'" Reed v. Farley, 512 U.S. 339, 354 (1994) (quoting Wainwright v. Sykes, 433 U.S. 72, 84 (1977)); accord Frady, 456 U.S. at 167; United States v. Pipitone, 67 F.3d 34, 38 (2d Cir. 1995); Douglas v. United States, 13 F.3d 43, 46 (2d Cir. 1993).

"'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot be fairly attributable to him . . . ." Coleman v. Thompson, 501 U.S. 722, 753 (1991) (emphasis in original); Marone v. United States, 10 F.3d 65, 67 (2d Cir. 1993). If the movant cannot show cause, relief may still be available in "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." McClesky v. Zant, 499 U.S. 467, 494 (1991). In these cases, the movant must establish prejudice so substantial that it undermines the integrity of the entire proceeding. See Frady, 456 U.S. at 170. Stukes has not shown cause for his failure to raise this issue on appeal, nor has he demonstrated extraordinary prejudice so as to excuse that showing, and accordingly the claim of prosecutorial misconduct is barred.

18

## B.   **Counsel Was Not Constitutionally Ineffective**

Stukes has also claimed that his defense counsel committed error by (1) failing to cross-examine Officers Johnson and Finegan on alleged inconsistencies in their testimony; (2) failing to impeach Officer Johnson's testimony that he saw the magazine fall out of the gun; (3) failing to recognize and make known to the jury the fact that government exhibit 24 (the magazine) was not the magazine recovered from Stukes; (4) failing to pursue lines of impeachment examination after the government revealed that the magazine in evidence was not the one recovered by Officer Johnson; and (5) failing to advise Stukes properly to accept a plea offer made by the Government mid-trial.

A defendant claiming ineffective assistance of counsel must demonstrate that: (1) "counsel's representation fell below an objective standard of reasonableness" determined according to "prevailing professional norms," Strickland v. Washington, 466 U.S. 668, 688 (1984), and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see also Murden v. Artuz, 497 F.3d 178, 198 (2d Cir. 2007).

A defendant cannot prevail on a claim of ineffective assistance of counsel merely because he believes that his counsel's strategy was inadequate. United States v. Sanchez, 790 F.2d 246, 253 (2d Cir. 1986). See also Mason v. Scully, 16 F.3d 38, 42 (2d Cir. 1994) ("Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance."). Stukes' first four grounds for his claim fail because they constitute mere challenges to trial counsel's strategic decisions.

Stukes first argues that his counsel should have cross-examined Johnson and Finegan as to their inconsistent recollections of where Johnson had handed over the gun on the night of the arrest. However, Stukes has failed to demonstrate the relevance of this discrepancy, or how cross-examination on the issue would have supported his case. While it is within the realm of possibility that cross-examination could have had some impact on the witnesses' credibility, it is more likely that defense counsel chose not to emphasize this minor inconsistency given the more significant discrepancies between the witnesses' testimony and the physical evidence with regard to the magazine. In any event, Stukes has not shown any prejudice resulting from counsel's failure to cross Officers Johnson and Finegan on this

20

issue. Stukes' first grounds therefore does not support a
Strickland challenge.

Stukes' second argument is that trial counsel failed
to exploit the inconsistency between Officer Johnson's testimony
that the magazine fell out of the gun after Stukes threw it and
the fact that the magazine received into evidence would not fit
into the gun. As set forth above, defense counsel made this
point a central one in his summation in his attack on Officer
Johnson, and it was for this reason that counsel presumably did
not make an effort to make further use of the conclusions drawn
from Government Exhibit 3506N.

Stukes' third and fourth arguments are essentially the
same: counsel did not exploit effectively the fact that the
magazine received in evidence was not the one seized on January
14, 2003. As set forth above, counsel made a strategic choice
to leave the jury with the impression that the magazine in
evidence was in fact the magazine recovered that night, on the
apparent view that it tended to undermine Officer Johnson's
testimony and the proof concerning Stukes' possession of a
firearm. Since it was possession of a gun, not a magazine, that
Stukes was charged with, counsel's strategic decision was not
unreasonable. Although the strategy was ultimately

21

unsuccessful, it was a considered choice by experienced defense counsel. "In assessing reasonableness of performance, we must view the defendant's claim through the eyes of trial counsel, not through the distorting effects of hindsight. Actions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." United States v. Javino, 960 F.2d 1137, 1145 (2d Cir. 1992) (quotations omitted).

Finally, Stukes has alleged that he turned down the Government's plea offer, made upon the discovery of the discrepancy revealed by Exhibit 3506N, because defense counsel "insisted that he would be able to get the gun charges thrown out." Mot. at 13.

The failure to give advice as to how to deal with an offered plea bargain constitutes ineffective assistance of counsel. Boria v. Keane, 99 F.3d 492 (2d Cir. 1996). An attorney discharges his or her duty by informing defendant of the terms of a plea offer, the strengths and weaknesses of the case against him, and the alternative sentences to which he will most likely be exposed. Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000). A lawyer must take care, however, not to coerce a client into accepting or rejecting a plea offer. Id.

22

"Counsel's conclusion as to how best to advise a client in order
to avoid, on the one hand, failing to give advice and, on the
other, coercing a plea enjoys a wide range of reasonableness
because '[r]epresentation is an art,' and '[t]here are countless
ways to provide effective assistance in any given case." Id.
(quoting Strickland, 466 U.S. at 693, 689).

Here, Stukes' counsel made a lengthy statement on the
record to reflect his consultation with Stukes regarding the
Government's plea offer:

> I place this on the record for any
> future matter that may arise with respect to
> my client.    The government came forward
> based upon what has happened here.    They
> believe they could still make their case
> with respect to all the charges.   But, the
> other day . . . I approached the Government
> and asked them whether they could consider
> dismissing the gun count and allowing my
> client to plead guilty to the distribution
> counts.    The government said no.    The
> government came to me this morning and
> indicated they had revisited that situation
> and were now prepared to make such an offer.

> I've communicated it to my client and
> advised him of what it would mean.  I don't
> have the exact guideline calculations.   And
> I   advised   him   of   where   he   was   with
> acceptance of responsibility prior to trial,
> what   the   position   might   be   concerning
> acceptance of responsibility, what he would
> be facing with or without that, without the
> 924C count and without any other enhancement
> for the weapon.  My client understands.   He
> continues to maintain his position and we
> would go forward with trial.

Tr. 737-38.  Counsel's statement indicates the discharge of his duty to inform Stukes of the fact and import of the plea offer. His account of soliciting the plea offer from the Government undercuts Stukes' assertion that counsel "insisted that he would be able to get the gun charges thrown out," as does the statement that the Government continued to believe that it could make its case with respect to all the charges.  Stukes did not object to his attorney's statement when it was made, nor did he assert ineffective assistance of counsel on appeal.  Finally, the rational basis of Stukes' argument is suspect.  Stukes fails to explain why counsel's alleged insistence that he would be able to get the gun charges thrown out would convince Stukes to reject a plea bargain in which the Government dropped those very charges, particularly in light of the strong evidence of guilt with regard to the distribution charges.

For these reasons, Stukes has failed to establish that his counsel was ineffective, or that as a result he was deprived of a fair proceeding.

## IV.   CONCLUSION

For the reasons set forth above, Stukes' section 2255 motion is denied and the petition dismissed.

It is so ordered.

New York, N.Y.
July  / 2  , 2008

ROBERT W. SWEET
U.S.D.J.